UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| LOREN G. JORGENSON,<br><br>              Plaintiff,<br><br>    vs.<br><br>NANCY A. BERRYHILL, Acting<br>Commissioner, Social Security<br>Administration,<br><br>              Defendant. | CIV. 16-5017-JLV<br><br><br>ORDER |

        Plaintiff Loren Jorgenson filed a complaint appealing the final decision of

Nancy A. Berryhill,[1] the Acting Commissioner of the Social Security

Administration, finding him not disabled.   (Docket 1).   Defendant denies

plaintiff is entitled to benefits.   (Docket 9).   The court issued a briefing schedule

requiring the parties to file a joint statement of material facts ("JSMF").   (Docket

11).   The parties filed their JSMF.   (Docket 12).   The parties also filed a joint

statement of disputed facts ("JSDF").[2]   (Docket 12-1).   For the reasons stated

---

[1]Nancy A. Berryhill became the Acting Commissioner of Social Security on
January 20, 2017.   Pursuant to Fed. R. Civ. P. 25(d), Ms. Berryhill is
automatically substituted for Carolyn W. Colvin as the defendant in all pending
social security cases.   No further action need be taken to continue this suit by
reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C.
§ 405(g).

[2]The Commissioner objected to three of the JSDF as not being material or
relevant to the appeal.   See Docket 12-1 ¶¶ 2-4.   The Commissioner did not
object to the remainder of the JSDF.   Unless otherwise indicated, the court finds
the JSDF are factually accurate as contained in the administrative record and
will be referenced where appropriate.

below, plaintiff's motion to reverse the decision of the Commissioner (Docket 15) is denied.

## FACTUAL AND PROCEDURAL HISTORY

The parties' JSMF (Docket 12) and JSDF (Docket 12-1) are incorporated by reference.   Further recitation of salient facts is incorporated in the discussion section of this order.

On May 20, 2013, Mr. Jorgenson filed an application for disability insurance ("DI") benefits under Title II and supplemental social security income ("SSI") benefits under Title XVI, alleging an onset of disability date of December 25, 2008.[3]   (Docket 12 ¶ 1).   On October 8, 2014, the ALJ issued a decision finding Mr. Jorgenson was not disabled.   Id. ¶ 6; see also Administrative Record at pp. 17-27 (hereinafter "AR at p. ____").   The Appeals Council denied Mr. Jorgenson's request for review and affirmed the ALJ's decision.   (Docket 12 ¶ 9). The ALJ's decision constitutes the final decision of the Commissioner of the Social Security Administration.   It is from this decision which Mr. Jorgenson timely appeals.

The issue before the court is whether the ALJ's decision of October 8, 2014, that Mr. Jorgenson was not "under a disability, as defined in the Social Security Act, from December 25, 2008, [through October 8, 2014]" is supported by substantial evidence in the record as a whole.   (AR at p. 27) (bold omitted);

---

[3]Mr. Jorgenson previously applied for benefits in November 2000, March 2004, August 2009 and April 2011.   (Docket 12 ¶ 3).

see also Howard v. Massanari, 255 F.3d 577, 580 (8th Cir. 2001) ("By statute, the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive.") (internal quotation marks and brackets omitted) (citing 42 U.S.C. § 405(g)).

## STANDARD OF REVIEW

The Commissioner's findings must be upheld if they are supported by substantial evidence in the record as a whole.   42 U.S.C. § 405(g); Choate v. Barnhart, 457 F.3d 865, 869 (8th Cir. 2006); Howard, 255 F.3d at 580.   The court reviews the Commissioner's decision to determine if an error of law was committed.   Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992).   "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."   Cox v. Barnhart, 471 F.3d 902, 906 (8th Cir. 2006) (internal citation and quotation marks omitted).

The review of a decision to deny benefits is "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision . . . [the court must also] take into account whatever in the record fairly detracts from that decision."   Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (quoting Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001)).

It is not the role of the court to re-weigh the evidence and, even if this court would decide the case differently, it cannot reverse the Commissioner's decision

if that decision is supported by good reason and is based on substantial evidence.  Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005).   A reviewing court may not reverse the Commissioner's decision " 'merely because substantial evidence would have supported an opposite decision.' "  Reed, 399 F.3d at 920 (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995)). Issues of law are reviewed *de novo* with deference given to the Commissioner's construction of the Social Security Act.   See Smith, 982 F.2d at 311.

The Social Security Administration established a five-step sequential evaluation process for determining whether an individual is disabled and entitled to DI benefits under Title II or SSI benefits under Title XVI.   20 CFR §§ 404.1520(a) and 416.920(a).[4]   If the ALJ determines a claimant is not disabled at any step of the process, the evaluation does not proceed to the next step as the claimant is not disabled.   Id.   The five-step sequential evaluation process is:

> (1) whether the claimant is presently engaged in a "substantial gainful activity"; (2) whether the claimant has a severe impairment—one that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education, and work experience); (4) whether the claimant has the residual functional capacity to perform . . . past relevant work; and (5) if the claimant cannot

---

[4]The criteria under 20 CFR § 416.920 are the same under 20 CFR § 404.1520.  Boyd v. Sullivan, 960 F.2d 733, 735 (8th Cir. 1992).  All further references will be to the regulations governing DI benefits, unless otherwise specifically indicated.

perform the past work, the burden shifts to the Commissioner to prove there are other jobs in the national economy the claimant can perform.

Baker v. Apfel, 159 F.3d 1140, 1143-44 (8th Cir. 1998).   The ALJ applied the five-step sequential evaluation required by the Social Security Administration regulations.   (AR at pp. 18-19).

### STEP ONE

At step one, the ALJ determined Mr. Jorgenson had "not [been] engaged in substantial gainful activity since December 25, 2008, the alleged onset date." Id. at p. 19 (bold omitted).

### STEP TWO

At step two, the ALJ must decide whether the claimant has a medically determinable impairment that is severe or a combination of impairments that are severe.   20 CFR § 404.1520(c).   A medically determinable impairment can only be established by an acceptable medical source.   20 CFR § 404.1513(a). Accepted medical sources include, among others, licensed physicians.   Id.   "It is the claimant's burden to establish that his impairment or combination of impairments are severe."   Kirby v. Astrue, 500 F.3d 705, 707 (8th Cir. 2007).

The regulations describe "severe impairment" in the negative.   "An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities." 20 CFR § 404.1521(a).   An impairment is not severe, however, if it "amounts to only a slight abnormality that would not significantly limit the claimant's

5

physical or mental ability to do basic work activities."   Kirby, 500 F.3d at 707. Thus, a severe impairment is one which significantly limits a claimant's physical or mental ability to do basic work activities.

The ALJ identified Mr. Jorgenson suffered from the following severe impairment: "right lower extremity chronic pain syndrome."   (AR at p. 19) (bold omitted).   Mr. Jorgenson challenges this finding.   (Docket 16 at pp. 22-26).   He asserts the ALJ erred by not finding his "combined mental disorders . . . severe." Id. at p. 26.

The basis for plaintiff's challenge is two-fold.   First, Dr. Donald Burnap diagnosed a "personality disorder, PTSD [post-traumatic stress disorder], and chronic pain syndrome."   Id. at p. 23 (referencing Docket 12-1 ¶ 67).   Second, Dr. Brett Valette diagnosed a "nonspecific personality disorder with schizoid features, somatization disorder, and dysthymia."   Id. (referencing Docket 12-1 ¶ 69).   Mr. Jorgenson claims his combined mental disorders are severe.

> [The] combined mental disorders clearly had more than minimal impact on work-related functioning, evident in his history of walking away from jobs, interspersed with incarcerations; life-long problem of not fitting in and not being able to put up with people; odd and unhygienic appearance and dress; reclusiveness; his very restricted activities of daily living; and his experience of severe pain in multiple joints and in all fibromyalgia trigger points.

Id. at p. 25.   Mr. Jorgenson claims "the ALJ's rejection of Jorgenson's mental disorders as a 'severe' impairment negatively influenced assessments of credibility and residual functional capacity, resulting in an unsupported step five determination."   Id.

6

The Commissioner argues the ALJ's decision is supported by the substantial weight of the evidence.   (Docket 17 at pp. 3-6).   The Commissioner contends Mr. Jorgenson "does not even attempt to reconcile his reliance on the opinion from [Dr.] Burnap . . . which was issued in 2004, with the undisputed fact that [Mr. Jorgenson] was denied disability in prior applications that were filed subsequent to the opinion . . . . More important is his failure to reconcile Dr. Burnap's opinion with [claimant's] performance of work years after Dr. Burnap's opinion . . . ."  Id. at p. 6.

In rebuttal, Mr. Jorgenson argues the "Commissioner overlooks that Dr. Burnap, describing the effects of Jorgenson's psychiatric disorders, stated that he clearly had marked difficulty interacting with people under any circumstances."  (Docket 18 at p. 2).   He claims "Dr. Burnap's opinion was the first medical evidence . . . [in] the record. . . . . No adjudicator stated a reason to ignore Dr. Burnap's opinion that included longstanding posttraumatic stress disorder and personality disorder.   The ALJ stated no reason to reject it, and there is no rationale to review."  Id. at p. 3.

The decision at step-two has an impact on the ALJ's credibility analysis and the remaining steps of the evaluation process.  Pratt v. Sullivan, 956 F.2d 830, 836 (8th Cir. 1992).   For that reason, the court will provide a detailed summary of the medical evidence surrounding the step-two determination.

In 2004, Psychiatrist Donald Burnap conducted a consultative evaluation of Mr. Jorgenson.   (Docket 12-1 ¶ 6).   During the examination, Dr. Burnap

7

learned Mr. Jorgenson witnessed his girlfriend's violent death in 1997.   Id. ¶ 9.

Following that traumatic event, Mr. Jorgenson reported experiencing nightmares

and daytime flashbacks of the event.   Id. ¶ 10.   Approximately four years later

Mr. Jorgenson was involved in a truck accident in which his semi-tractor and

trailer went off the road and he suffered upper-body injuries.[5]   Id. ¶ 11.   As a

result of the crash, Mr. Jorgenson told Dr. Burnap that he still had "ongoing

pain, mainly in the upper extremities" and that he was "fearful of getting back

into a truck driving situation."   Id.   Mr. Jorgenson stated that if he was able

drive without "severe pain[,] he would resume driving a truck regardless of his

fears."   Id.   As of the date of Dr. Burnap's examination Mr. Jorgensen had not

worked for two years.   Id. ¶ 13.

During the mental status examination, Dr. Burnap found Mr. Jorgenson

alert and cooperative and his behavior appropriate for the setting.   Id. ¶ 14.

Physically, Mr. Jorgenson was "tall and very thin," with "poor" grooming and

dress and a "relatively strong body odor."   Id.   Dr. Burnap found Mr. Jorgenson

"moderately depressed and his affect is moderately flattened consistent with his

depression."   Id.   Dr. Burnap diagnosed Mr. Jorgenson as suffering with

"post-traumatic stress disorder; major depressive disorder; personality disorder,

not otherwise specified, mainly cluster B; and chronic pain syndrome secondary

---

[5]Mr. Jorgenson was not hospitalized because of his injuries.   (AR at
p. 332).

to some organic cause." Id. ¶ 67.   Dr. Burnap described Mr. Jorgenson's
limitations in the following manner:

> This man has clearly had a relatively longstanding personality
> disorder.   His lifestyle has been distinctly different from the
> typical standards of society.   He has been in trouble with law
> numerous times.   However, all along he has managed to
> maintain gainful employment.   His longest vocation has been as
> a long haul truck driver.   His lack of ongoing relationships is
> consistent with a cluster B type of personality disorder.   Also,
> notably he has not been able to maintain a residence of his own
> and throughout practically all of his life has lived with his
> parents.   The exceptions are times spent in jail.

Id.   On August 2, 2004, Dr. Burnap assigned him a global assessment of
function ("GAF") score of "50."[6]   Id.   Dr. Burnap concluded Mr. Jorgenson
"appears to have a chronic pain disorder and . . . based on the pattern of his
emotional experience during this time and observed behavior on mental status,
he does indeed have bona fide pain, which is limiting function."   Id. ¶ 68.

Mr. Jorgenson's argument the ALJ erred by not adopting Dr. Burnap's
2004 opinions is misplaced.   Mr. Jorgenson had an extensive personal and work

---

[6]GAF is a numeric rating, on a scale of 0 to 100, used to rate subjectively
an individual's "overall level of functioning" by rating symptom severity and
social, occupational, or psychological functioning.   See American Psychiatric
Ass'n, Diagnostic and Statistical Manual of Mental Disorders, "Axis V: Global
Assessment of Functioning" at Axis V: Global Assessment of Functioning" at *34
(DSM-IV-TR 2000).   Where the symptom severity and level of functioning are
discordant, the GAF rating reflects the worst of the two.   Id.   GAF ratings
represent current levels of functioning "because ratings of current functioning
will generally reflect the need for treatment or care."   Id.   "[A] GAF of 51 to 60
indicates the individual has '[m]oderate symptoms . . . or moderate difficulty in
social, occupational, or school functioning . . ."   Nowling v. Colvin, 813 F.3d
1110, 1115 n.3 (8th Cir. 2016) (internal citations omitted).

history in the years after 2004.   In 2005, Mr. Jorgenson was convicted of driving while under the influence of alcohol and spent a year in a county jail.   Id. ¶ 62. When released from jail, he ran a bobcat at the Black Hills Nursery, which ended "unsuccessfully" without explanation.   Id.

In 2006, Mr. Jorgenson worked for a Canadian trucking company.   Id. ¶ 63; see also AR at p. 283.   He described this as the "best job I ever had in my life."   They "treat[ed] their drivers right . . . . They told me I would not touch freight, all I had to do was drive . . . . I drove all over the place, even Canada." (Docket 12-1 ¶ 63).   He reported the company was sold to a group in Montana who wanted him to work for them because of his "safety record, no violations." (AR at p. 283).   Mr. Jorgenson stated he was not able to continue working for the new company because he "couldn't leave the state of South Dakota because [he] owed child support."   (Docket 12-1 ¶ 63; AR at p. 283).

In 2007, Mr. Jorgenson returned to work at the Black Hills Nursery. (Docket 12-1 ¶ 64; AR at p. 284).   In this job, he "drove a bobcat and unloaded trucks. . . . [He] was always doing anything [he] could."   (AR at p. 284).   Mr. Jorgenson left this job "to work for Fresh Start Convenience Store, driving again." Id.   In 2007-2008, Mr. Jorgenson worked for Fresh Start Convenience Stores driving a truck in "4 or 5 states."[7]   Id.   He could not remember why the job

_____

[7]Mr. Jorgenson provides no explanation as to how he could engage in interstate trucking for the Fresh Start Convenience Store but not do interstate trucking for the Montana company in 2006.

ended, but "there might have been a vehicle issue where I couldn't get there. There might have been an altercation where I walked away."   (Docket 12-1 ¶ 64).

Mr. Jorgenson returned to trucking later in 2008 working for Dakota Express Transport.   (AR at p. 284).   In 2009, he quit.

> I heard another driver talking on the CB about the accident when my girlfriend killed herself . . . [in] 1997, and I was having a long flashback that got worse and worse and I couldn't take it anymore. It was like it just happened yesterday. Mentally I wasn't there, I couldn't control myself, and told [my boss] I need my money, here's your keys and phone.

(Docket 12-1 ¶ 65).   After that, Mr. Jorgenson did not work.   His explanation is that "[a] truckdriver with experience should be making over $54,000 to $100,000 a year.   But I just don't get along with people, and things happen and I get the hell out of there to get away from people and not hurt anybody."   Id. ¶ 66.

Mr. Jorgenson's post-employment medical history further diminishes the significance of Dr. Burnap's 2004 opinion.   On April 16, 2010, Mr. Jorgenson saw Dr. Jon Wingert of Creekside Family Practice in Rapid City, South Dakota. (AR at p. 332).   Mr. Jorgenson complained of swelling of his right lower leg up to the knee.   Id.   He reported having been to the emergency room twice in the past month for this condition.[8]   Id.   Mr. Jorgenson reported he had recently completed an antibiotic prescription received from the emergency room.   Id. Dr. Wingert assessed "[e]dema of the right lower extremity for four months with 2+ pitting edema."   (Docket 12-1 ¶ 16).   Mr. Jorgenson was given compression

---

[8]No emergency room medical records appear in the administrative record.

11

stockings and a prescription for Lasix.   Id.   There is no mention of any mental health issues during this clinical visit.   See AR at p. 332 and Docket 12-1 ¶ 16.

On May 5, 2010, Mr. Jorgenson saw Dr. Donald Blower at the Community Health Center in Rapid City.[9]   (Docket 12-1 ¶ 17; see also AR at p. 335).   Mr. Jacobsen complained of right leg swelling up to the knee.   (Docket 12-1 ¶ 17).   Dr. Blower assessed right leg edema and peripheral neuropathy and prescribed Gabapentin.   Id. ¶ 19.   There was no mention of any mental health issues during this visit.   See id. ¶¶ 17-19.

On August 26, 2013, Clinical Psychologist Brett Valette conducted a consultative examination of Mr. Jorgenson.[10]   Id. ¶ 19.   Discussing his 2002 tractor-trailer accident with Dr. Valette, Mr. Jorgenson had "no idea" what type of injuries he suffered because he "didn't see a doctor for a month."   (AR at p. 342).   He said "[n]o one would see me because of insurance and the type of insurance I had."   Id.   Dr. Valette reported Mr. Jorgenson said the chronic pain was bad beginning in 2002, but he was able to drive trucks until 2009 because a "doctor lied on [the DOT] physical so [he] could pass it."   Id. at 343.   Mr. Jorgenson reported now having "PTSD, back pain, shoulder pain, bone pain, chest pain, and numbness in his wrists. . . . [and] now he can't work because of

---

[9]The parties identify this clinic visit as occurring on May 10, 2010.   See Docket 12-1 ¶ 17.   The clinic notes in the administrative record indicate the clinic contact occurred on May 5, 2010.   See AR at p. 335.

[10]The parties identify Dr. Valette's diagnosis as having occurred on September 5, 2013.   See Docket 12-1 ¶ 69.   That was the date of Dr. Valette's signature on his August 26, 2013, report.   (AR at p. 345).

his chronic pain . . . [which] has progressively gotten worse . . . ."   (Docket 12-1

¶ 20).   Mr. Jorgenson denied any current PTSD symptoms.   (AR at p. 344).

During the mental status examination, Dr. Valette reported:

> Overall, the client's cooperative.   He's actually quite friendly.   A lot of times, people in chronic pain will be irritable.   They'll be moving around.   There will be pain expressions.   He didn't have any of them.   He presented of somewhat low energy.   He appeared to have some pain when he stood up, but when he was sitting there, he seemed fine .   .   .   .   During some of this exam, he actually looked relaxed during evaluation with no pain behavior.   He never had any pain expression except when he stood up out of the chair.   Occasionally he even smiled and chuckled.   There were some times he appeared low energy and mildly depressed.   Organization and character of speech was clear, concise, spontaneous. . . .Thought process was organized and clear.   I did not pick up any cognitive difficulties. . . . There's no psychotic process.   He's oriented x3.

Id.; see also Docket 12-1 ¶¶ 25-29.   Dr. Valette observed good short term

memory, correct recitation on "serial 7s," and appropriate abstract thinking,

judgment and reasoning.   Id.   Dr. Valette's diagnostic impressions were

somatization disorder,[11]  mild dysthymia,[12]  nonspecific personality

---

[11]Somatoform disorder is manifested by "[p]hysical symptoms for which there are no demonstrable organic findings or known physiological mechanisms." 20 CFR part 404, subpart P, app. 1, § 12.07.

[12]Dysthymia is "[a] chronic mood disorder manifested as depression for most of the day, more days than not, accompanied by" other symptoms. Stedman's Medical Dictionary 122470 (27th ed. 2000).

disorder[13] with schizoid features, chronic pain complaints, mild to moderate psychological stressors and GAF of "60 to 65."[14]   (AR at p. 345).   Dr. Valette's report concluded:

> Overall, I am concerned about symptom exaggeration and somatization disorder.   He comes across as a loner.   That's why he likes driving a truck.   The inconsistent parts here are that he worked up until 2009 after his accident in 2002.   He has vague descriptions of his symptoms and his problems.   He did not appear to be in pain during most of this evaluation.[15]   His cognitive functioning appears to be intact.  He says his daily activities and social activities are interrupted because of his pain, but I question that.   I think he should be seen by a pain specialist.   From what he describes, he might have a low-grade mild dysthymia, but I think the major issue is his schizoid isolated personality features, but that's why he liked driving a truck and he says he can't drive a truck because of his physical complications and pain and he cannot pass a DOT physical.

Id.; see also Docket 12¶ 69.

---

[13]A personality disorder is a "general term for a group of behavioral disorders characterized by usually lifelong ingrained maladaptive patterns of subjective internal experience and deviant behavior, lifestyle, and social adjustment, which patterns may manifest in impaired judgement, affect, impulse control and interpersonal functioning."   Stedman's Medical Dictionary 116700 (27th ed. 2000).

[14]"A GAF score of 60 means that the patient has 'moderate symptoms . . . or moderate difficulty in social, occupational, or school functioning.' "   Wright v. Colvin, 789 F.3d 847, 855 (8th Cir. 2015) (internal citation omitted).   "A [GAF] score of 61 to 70 indicates some mild symptoms but generally functioning pretty well with some meaningful interpersonal relationships."   Symes v. Colvin, No. 14-CV-04127, 2015 WL 4041680, at *2 n.7 (D.S.D. July 1, 2015) (internal citation omitted).

[15]Dr. Valette's clinical interview and mental status examination took approximately 3.25 hours.   (AR at p. 346).

On September 13, 2013, Dr. Rolf Norlin conducted a physical consultative examination.   (Docket 12-1 ¶ 70).   Relevant to the mental health impairment issue, Dr. Norlin's clinical impression was that Mr. Jorgenson's problems were "depression, anxiety, personality disorder and PTSD."   Id.   Most importantly, however, Dr. Norlin expressly stated that he would "defer to mental health" as to the mental health issues.   Id.

Mr. Jorgenson has no treating psychiatrist, psychologist or other mental health care provider who addresses the impact of his mental impairments.   The ALJ is entitled to rely upon the examination and report of Dr. Valette.   Dr. Valette's opinions are supported by non-examining consultative psychologist, Dr. Thomas Atkin, the two state agency consultants and the record as a whole. While Mr. Jorgenson's functional report and testimony identify physical consequences in each of the four functional areas, the report and his testimony do not support a claim of severe mental impairment, either individually or in combination.

The ALJ considered the "four broad functional areas . . . known as the 'paragraph B' criteria."   (AR at p. 20).   The ALJ addressed each of those areas. Id. at pp. 20-21.   In the first functional area, activities of daily living ("ADL"), the ALJ found "no limitations."   Id. at p. 20.   With identified physical limitations, the ALJ found the record supported the conclusion Mr. Jorgenson had no mental condition which interfered with the ability to perform ADL.   Id.   It is not the role

15

of the court to re-weigh the evidence if the ALJ's decision is supported by good reason and is based on substantial evidence.   <u>Guilliams</u>, 393 F.3d at 801.

In the second functional area, social functioning, the ALJ found "no limitations."   <u>Id.</u>   While a state agency consulting psychologist found "mild limitations," the record supports the ALJ's conclusion that Mr. Jorgenson had no mental impairments which affected his abilities in the area of social functioning. <u>Id.</u>   <u>Guilliams</u>, 393 F.3d at 801.

In the third functional area, which consists of "concentration, persistence or pace," the AJL found "no limitations."   <u>Id.</u>   The ALJ resolved the differences between Mr. Jorgenson's self-reported explanations in this functional area and Dr. Valette's conclusions the claimant had "low grade mild dysthymia," but his "cognitive function[s] [were] intact."   <u>Id</u> at p. 21.   The ALJ articulated sound reasons for adopting the opinion of Dr. Valette.   <u>Id.</u>   That decision is supported by good reason and is based on substantial evidence.   <u>Guilliams</u>, 393 F.3d at 801.

In the fourth functional area, episodes of decompensation, the ALJ found Mr. Jorgenson "has experienced no episodes of compensation, which have been of extended duration."   (AR at p. 21).   Mr. Jorgenson points to no evidence in the record which challenges this finding.   <u>See</u> Dockets 16 & 19.

The court finds the ALJ's finding at step two is supported by substantial evidence in the record as a whole.   42 U.S.C. § 405(g); <u>Guilliams</u>, 393 F.3d at 801.

**STEP THREE**

At step three, the ALJ determines whether claimant's impairment or combination of impairments meets or medically equals the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 ("Appendix 1"). 20 CFR §§ 404.1520(d), 404.1525, and 404.1526.   If a claimant's impairment or combination of impairments meets or medically equals the criteria for one of the impairments listed and meets the duration requirement of 20 CFR § 404.1509, the claimant is considered disabled.   At that point the Commissioner "acknowledges [the impairment or combination of impairments] are so severe as to preclude substantial gainful activity. . . . [and] the claimant is conclusively presumed to be disabled."   Bowen v. Yuckert, 482 U.S. 137, 141 (1987).

The ALJ determined Mr. Jorgenson did not have an impairment or combination of impairments which met or were medically equal to one of the impairments listed in Appendix 1.   (AR at p. 21).   The ALJ "considered listings 1.02, but found that the criteria for these listings were not satisfied."   The ALJ's reference is to a "[m]ajor dysfunction of a joint."   Appendix 1 ¶ 1.02.   Mr. Jorgenson does not challenge this finding.   (Docket 16).

**STEP FOUR**

Before considering step four of the evaluation process, the ALJ is required to determine a claimant's residual functional capacity ("RFC").   20 CFR §§ 404.1520(e).   RFC is a claimant's ability to do physical and mental work activities on a sustained basis despite any limitations from his impairments.

17

20 CFR §§ 404.1545(a)(1).   In making this finding, the ALJ must consider all of the claimant's impairments, including those which are not severe.   20 CFR §§ 404.1545(e).   All of the relevant medical and non-medical evidence in the record must be considered.   20 CFR §§ 404.1520(e) and 404.1545.

"The ALJ should determine a claimant's RFC based on all the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of [her] limitations."   Lacroix v. Barnhart, 465 F.3d 881, 887 (8th Cir. 2006) (quoting Strongson v. Barnhart, 361 F.3d 1066, 1070 (8th Cir. 2004)); see also Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007) (because RFC is a medical question, the ALJ's decision must be supported by some medical evidence of a claimant's ability to function in the workplace, but the ALJ may consider non-medical evidence as well); Guilliams, 393 F.3d at 803 ("RFC is a medical question, and an ALJ's finding must be supported by some medical evidence.").   The ALJ "still 'bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence.' "   Id. (citing Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir. 2000)).

"In determining RFC, the ALJ must consider the effects of the combination of both physical and mental impairments."   Stormo v. Barnhart, 377 F.3d 801, 807 (8th Cir. 2004) (citing Baldwin v. Barnhart, 349 F.3d 549, 556 (8th Cir. 2003)).   As stated earlier in this discussion, a severe impairment is one which

significantly limits an individual's physical or mental ability to do basic work activities.   20 CFR § 404.1521(a).

The ALJ found Mr. Jorgenson's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision."   (AR at p. 23).

Mr. Jorgenson challenges the ALJ's credibility finding.   (Docket 16 at pp. 26-31).   He claims "the ALJ failed the balancing test of evidence that supports vs. evidence that detracts from credibi[l]ity.   Evidence in the record as a whole established that Jorgenson was credible."   Id. at p. 31.

The ALJ questioned Mr. Jorgenson's claims of "disabling pain and swelling of the right [leg]" because there was "a significant gap in treatment from 2004 until 2010, even though the claimant alleged an onset [of disability] date of December 2008."   (AR at p. 23).   The ALJ then detailed the two medical appointments in April and May 2010 discussed above.   Id.; see, supra, at pp. 11-12.   The ALJ noted the absence of any additional medical treatment after 2010.   "The record showed no treatment for any complaint after May 2010, not even emergency room visits for any allegedly disabling complaint. . . . [Even though he] reported difficulty getting work due to chronic fatigue and chronic pain, as well as his mental inability to get along with co-workers and superiors . . . ."   (AR at p. 23).

19

Mr. Jorgenson argues it is unclear whether this gap in medical care was "actual or resulted from failure to develop the evidence . . . ."  (Docket 16 at p. 26).   He contends "gaps in treatment [are] consistent with [his] personality disorder with schizoid features and post-traumatic stress disorder. . . . [as] avoidance is a central feature of both disorders."  Id. at pp. 26-27.   Mr. Jorgenson does not address what was different in 2010 from the preceding seven or eight years, since Mr. Jorgenson sought out medical care from two pay-as-you-go medical facilities in 2010, one of which was a "sliding fee" clinic. Certainly, Mr. Jorgenson's pain level seems to have been elevated in the spring of 2010, but at the same time this diminishes the claim that he was always in chronic pain.

The ALJ noted that when Mr. Jorgenson was seen by Dr. Norlin on September 19, 2014, for a physical consultative examination, he told the doctor that "he spent his days doing nothing, not even reading or watching television . . . did very little chores around the house . . . performed personal hygiene care irregularly. . . . . [and] he could sit for one hour, but stand and walk for 10 to 15 minutes."  (AR at pp. 23-24).   Dr. Norlin's physical examination found "impaired lumbar spine range of motion and decreased range of motion of the shoulders, bilaterally.   Fine manipulation was slow, but accurate. . . . Fibromyalgia trigger points were all positive in the upper torso and anterior chest . . . . [with] diminished sensation in the right lower extremity with evidence of radiculopathy."  Id.at p. 24.   Despite Mr. Jorgenson's complaints of pain, Dr.

20

Norlin noted that during the examination he did not change positions to alleviate pain.   Id.   Dr. Norlin concluded Mr. Jorgenson "could sit for reasonable periods, but standing and walking would be significantly limited. . . . [He] could bend, but not squat, and . . . engage in repetitive motion with his hands 'fairly good' . . . [and] could perform all daily activities, if he chose to, but . . . right now he chose only to dress himself."   Id.

While Mr. Jorgenson wants the ALJ to adopt Dr. Norlin's physical findings as proof of his pain level, he argues "[s]ubstantial evidence does not support a finding of non-credibility based on inadequate personal care."   (Docket 16 at p. 27).   The ALJ's concerns about Mr. Jorgenson's credibility were not based solely on his personal health care but the other factors discussed below.

During the hearing, Mr. Jorgenson testified he watches YouTube videos and movies on his father's laptop computer.   (AR at pp. 49-50).   He acknowledges being on the computer between "a couple hours," and "four hours" every day.   (AR at p. 50).   Mr. Jorgenson testified he can sit for between "[t]wo to three hours, or four hours maybe if I had to push it."   Id.   At the hearing, he testified he could walk "an hour, hour and a half."   Id.   He acknowledged being able to squat and get back up slowly.   Id.   He is able to bend over and touch his toes.   Id.   Mr. Jorgenson testified he had a driver's license and acknowledged he was able to drive, although he chooses to only drive once or twice a month and is able to go out alone.   (AR at pp. 239 & 241).   He acknowledges engaging in social contact with friends when he is out and about or at the store shopping.

21

Id. at p. 242.   Yet, he claims to be "anti/social, [a] recluse, hermit."   Id. at p. 243.

Gayle Jorgenson ("Gayle"), claimant's father, testified his son did not do chores because Mr. Jorgenson would go to town, get groceries and then he would have to lay down for the rest of the day.   (AR at p. 54).   Gayle testified his son quit trucking because of the vibrations of over-the-road trucking.   Id. at p. 55.

The ALJ also considered the observations and opinions of Dr. Valette discussed above.   Id. at p. 24; see, supra, at pp. 12-14.

Dr. Valette's diagnostic impressions were somatization disorder, mild dysthymia, nonspecific personality disorder with schizoid features, chronic pain complaints, mild to moderate psychological stressors and GAF of "60 to 65."   Id. With this diagnosis, Dr. Valette observed that Mr. Jorgenson's "[o]rganization and character of speech was clear, concise, spontaneous. . . .Thought process was organized and clear.   I did not pick up any cognitive difficulties. . . . There's no psychotic process.   He's oriented x3."   Id. at 344.

Mr. Jorgenson does not mention Dr. Valette's pain observations and cognitive thinking conclusions, but rather claims it is unfair to judge Mr. Jorgenson's credibility on the ADL which he was able to perform.   (Docket 16 at pp. 28-29).   The ALJ did not ignore Dr. Valette's somatization disorder diagnosis.   The ALJ adopted Dr. Valette's findings as "consistent with the record."   Id. at p. 20.   The ALJ found Mr. Jorgenson "is more functional than what he now claims."   Id. at p. 24.

22

Finally, Mr. Jorgenson challenges the ALJ's decision to adopt the opinion of Psychologist Thomas Atkin who found Mr. Jorgenson's mental impairments "non-severe."   (Docket 16 at p. 34; see also Docket 12-1 ¶¶ 73-75).   As a non-examining psychologist, Dr. Atkin reviewed the administrative record and identified Mr. Jorgenson's psychological impairments.[16]   (AR at p. 38).   Mr. Jorgenson argues that "[w]hen a non-examining psychologist testifies as a medical expert and considers Sections 12.00C through 12.00H in compliance with 20 CFR § 404.1520a, the expert must of necessity consider disability and function reports (known as the 'E' exhibits) and testimony of the claimant." (Docket 16 at p. 36).

Dr. Atkin testified Mr. Jorgenson's "mental status evaluations" by the examining consulting psychologist, Dr. Valette, were "well within normal limits" and that "claimant doesn't allege limitations secondary to mental health."   (AR at p. 39).   By this testimony it is evident Dr. Atkin considered the functional reports containing Mr. Jorgenson's statements as to his limitations.   It is also clear from the ALJ's decision that the testimony of Mr. Jorgenson was a material basis for the determination that his mental impairments were not severe.   (AR at pp. 20-21).

---

[16]The ALJ wrote that Dr. Atkin "reviewed the entire record and listened to the testimony."   (AR at p. 20).   Dr. Atkin testified by telephone at the hearing and then hung up before others testified.   Id. at p. 42.   This drafting error by the ALJ is harmless and not prejudicial to the decision.   Forte v. Barnhart, 377 F.3d 892, 896 (8th Cir. 2004).

Finally, Mr. Jorgenson challenges the ALJ's credibility finding pursuant to Social Security Ruling ("SSR") 16-3p because the ALJ failed to consider the "striking feature of Jorgenson's reclusive, bundled-up, avoidant lifestyle." (Docket 16 at p. 31).   SSR 16-3P was not adopted until March 16, 2016.   See 2016 WL 1119029, at *12.   The ALJ's decision was issued on October 8, 2014. (Docket 12 ¶ 6; see also AR at p. 27).   Mr. Jorgenson's argument is without merit.

   "The ALJ was required to make an express credibility determination explaining why he did not fully credit [claimant's] complaints."   Lowe v. Apfel, 226 F.3d 969, 971 (8th Cir. 2000).   That finding must be "adequately explained and . . . supported by the record as a whole."   Id. at p. 972.   "The ALJ is in the best position to determine the credibility of the testimony and is granted deference in that regard."   Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001).

The ALJ properly considered Mr. Jorgenson's testimony and found it less than fully credible in light of the entire record.   Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006).   The ALJ's findings "adequately explain[]" the decision to give less credibility to Mr. Jorgenson's testimony and those findings are "supported by the record as a whole."   Lowe, 226 F.3d at 971-72.   The court must "defer to an ALJ's credibility finding as long as the ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so."   Schultz v. Astrue,

24

479 F.3d 979, 983 (8th Cir. 2007) (internal quotation marks and citations omitted).   The court will not disturb the ALJ's credibility determination.

After determining Mr. Jorgenson's credibility, the ALJ arrived at an RFC for use in step four.   The ALJ found Mr. Jorgenson's RFC permitted him to perform the following work activities:

> [L]ift and carry 20 pounds occasionally and 10 pounds   frequently. The claimant can stand and/walk about six hours in an eight-hour workday; and sit for about six hours in an eight-hour workday.   The claimant can push and/or pull within the lift/carry limits.   The claimant can occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; and occasionally balance, stoop, kneel, crouch, and crawl.   The claimant can reach overhead occasionally, and handle, finger, and feel without limitations.   The claimant is to avoid moderate exposure to extreme cold and hazardous machinery and heights.

(AR at p. 22).   To arrive at this RFC, the ALJ "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence . . . [and] opinion evidence . . . ."   Id.

Mr. Jorgenson challenges the ALJ's RFC decision because it gave greater weight to state agency non-examining physicians, Dr. Terry and Dr. Barker, as opposed to the opinion of Dr. Norlin, who conducted a physical examination. (Docket 16 at pp. 31-33).   Mr. Jorgenson argues "[u]naccountably, [Dr. Terry and Dr. Barker] said their opinions regarding physical RFC were based on Dr. Norlin's examination findings.   (AR at p. 32).   Mr. Jorgenson claims Dr. Norlin

designated him as only being qualified to perform sedentary work and rejection

of this opinion by the ALJ "was reversible error."   Id. at p. 33.

Dr. Terry, a consulting physician, conducted a non-examination records

evaluation on October 28, 2013.   (AR at p. 84).   Among other records available

for Dr. Terry's review were the report of Dr. Norlin of September 24, 2013, and

Dr. Valette's report of September 11, 2013.   (AR at pp. 76-77).   Dr. Terry's RFC

assessment addressed Dr. Norlin's assessment:

> The exam is significant for mild ROM impairment cervical, lumbar, bilateral shoulders.   Gait is antalgic, favoring RT leg.   Unstable heels and toes.   Unable to squat.   Amputation of L 5th finger. Musculoskeletal pain w/ fatigue.   Edema RT leg.   4/5 R LE strength.   Stand/walk significantly limited.   Cannot travel independently.   No manipulation limits.   No gross joint abnormality.   No atrophy or sensory abnormality.
>
> One time exam from non-TP documents.   RLE pain that appears to limit his activities.   Limiting to light work on even surfaces w/ postural limits appears to be most appropriate based on this one exam.   CEP [Dr. Norlin's opinion] given moderate weight [restrictions].
>
> Claimant reports less than sedentary limits.   Out of proportion to the objective exams.   Partially credible statements.   These findings complete the medical portion of the disability determination.

(AR at pp. 83-84) (punctuation, spelling and bracketing modified for ease of

comprehension).   Dr. Baker had the same records available as Dr. Terry.   Id. at

pp. 88-97.   Dr. Baker agreed with Dr. Terry's conclusions.   Id. at p. 96.

Mr. Jorgenson's argument that these consulting physicians relied on Dr.

Norlin's findings, but failed to articulate reasons for disagreeing with Dr. Norlin's

conclusion, is without merit.   Dr. Valette's report critically challenged Mr.

26

Jorgenson's chronic pain complaints.   Dr. Norlin's opinion is based on statements made to him by Mr. Jorgenson, statements which Mr. Jorgenson retracted in his later testimony.   See, supra, at p. 21.

Mr. Jorgenson challenges the ALJ's decision to adopt the opinions of Dr. Valette and Dr. Atkin over the opinions of Dr. Burnap before developing a RFC. (Docket 16 at pp. 33-34).   As discussed earlier in this order, Dr. Burnap's opinions in 2004 are only marginally relevant because of Mr. Jorgenson's subsequent personal life and work history.   Dr. Valette's 2013 mental health consultative examination of Mr. Jorgenson is more relevant to the current application for benefits.

The ALJ properly weighed the state agency physicians' reports giving those reports "great weight," and to the extent his report was consistent with the agency physicians' reports, "some weight" was given to Dr. Norlin's opinions. (AR at p. 25).   The court finds the ALJ's determination as to which physicians' reports to rely on is entitled to deference because it is supported by several valid reasons.   Mabry v. Colvin, 815 F.3d 386, 389 (8th Cir. 2016).

The court finds substantial evidence in this record which a reasonable mind might accept as adequate to support the ALJ's decision on Mr. Jorgenson's RFC.   The court finds substantial evidence in the record as a whole supports the Commissioner's decision.   Choate, 457 F.3d at 869.   The court further concludes no error of law was committed and the decision of the Commissioner should be affirmed.   Smith, 982 F.2d at 311.

27

## ORDER

Based on the above discussion, it is

ORDERED that plaintiff's motion to reverse the decision of the Commissioner (Docket 15) is denied.

IT IS FURTHER ORDERED that pursuant to sentence four of 42 U.S.C. § 405(g) the decision of the Commissioner is affirmed.

Dated March 27, 2017.

BY THE COURT:

/s/ *Jeffrey L. Viken*
_____
JEFFREY L. VIKEN
CHIEF JUDGE